**IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| EDWARD TITTERTON and, | : | CIVIL ACTION |
| CHRISTOPHER KELLY, | : | |
| *Plaintiffs*, | : | |
| v. | : | |
| | : | |
| JENKINTOWN BOROUGH, | : | |
| JENKINTOWN POLICE DEPARTMENT | : | |
| POLICE COMMISSIONER CHIEF | : | |
| ALBERT DIVALENTINO, individually | : | |
| and POLICE LIUTENANT | : | |
| RICHARD TUCKER, individually, | : | |
| *Defendants*. | : | NO. 20-5869 |

**MEMORANDUM**

**Kenney, J.**                                                                                        **July 7, 2021**

Plaintiffs Edward Titterton and Christopher Kelly, police officers with the Jenkintown Police Department, bring this action against the Borough of Jenkintown and two officers employed by the Borough, Albert DiValentino, the Borough's Police Chief, and Lieutenant Richard Tucker. Plaintiffs' amended complaint asserts First Amendment retaliation, due process, corresponding *Monell* claims, a Pennsylvania Whistleblower Law claim, and a host of Pennsylvania tort claims. Defendants move to dismiss the Amended Complaint in its entirety under Rule 12(b)(6), arguing Plaintiffs fail to state any claims.

## I. BACKGROUND[1]

Plaintiffs Edward Titterton ("Titterton") and Christopher Kelly ("Kelly") (collectively "Plaintiffs") are police officers with the Jenkintown Borough Police Department ("the

---

[1] We "accept as true all allegations in plaintiff's complaint as well as all reasonable inferences that can be drawn from them, and construe[] them in a light most favorable to the non-movant." *Tatis v. Allied Interstate, LLC*, 882 F.3d 422, 426 (3d Cir. 2018) (quoting *Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 262 n.27 (3d Cir. 2010)). We draw the following facts from the Complaint. *See Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) ("In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, [and] undisputedly authentic documents if the complaint's claims are based upon these documents.").

Department"),[2] the police force serving Defendant Jenkintown Borough ("the Borough"). Am. Compl. ¶¶ 10–12. Titterton joined the Department in 2010. *Id.* ¶ 16. He left his position in 2014 but returned in January 2016. *Id.* ¶¶ 16–17. Kelly joined the Department in 2008. *Id.* ¶ 18. The individual defendants are Albert DiValentino, the Department Police Commissioner ("DiValentino") and Richard Tucker, the Department Police Lieutenant ("Tucker"). *Id.* ¶¶ 13, 15.

In 2008, the Borough created a K-9 unit which Tucker ran until 2014, when he directed Titterton to establish a Police Benevolent Association ("PBA") as a non-profit tax-exempt corporation to manage the K-9 unit's funds. *Id.* ¶¶ 20–21. Titterton wrote the PBA's bylaws and included measures to ensure proper fiscal management of the K-9 unit. *Id.* ¶ 22. The bylaws established a voting procedure for the PBA's board to authorize expenditures. *Id.* The PBA board was required to keep an accounting of the K-9 unit's fund, which would be presented to all PBA members annually or at the request of any PBA board member. *Id.* ¶ 23.

Titterton left the Department in 2014 for another job but returned in January 2016. *Id.* ¶¶ 25–26. After rejoining the PBA upon his return, Titterton learned Tucker made an unauthorized $1,900 K-9 vehicle insert purchase for his take-home police vehicle. *Id.* ¶¶ 38–39, 43–44. In March 2017, while serving as the elected PBA vice president, Titterton discovered the PBA's non-profit tax-exempt status had been revoked for its 2014 failure to file tax returns. *Id.* ¶ 28. At the next PBA general meeting in "late 2017," Titterton and the PBA's president reported that the organization had lost its tax-exempt status. *Id.* ¶¶ 30–31. Titterton urged the PBA board to retain an accountant to regain the tax-exempt status and pay the delinquent taxes. *Id.* ¶ 31. The board preferred to create another non-profit entity so the PBA could continue to receive K-9 funds

---

[2] Though Plaintiffs' Amended Complaint asserts claims against the Jenkintown Police Department, the response withdraws those claims, conceding the Department is not a properly named party. Pl. Br. in Opp., ECF No. 16 at 15. Thus, we will dismiss the Department with prejudice.

without interruption and simultaneously close-out the suspended non-profit. *Id.* Titterton refused to support creating another non-profit entity without first satisfying the tax obligations. *Id.* ¶ 32. Titterton also learned that K-9 funds were being commingled with other PBA funds and warned the board of the unlawful commingling. *Id.* ¶ 33. After his warning, Titterton learned the commingling of funds continued. *Id.* ¶ 34. At some point thereafter, Titterton informed the Borough's Administrative Business Office of the PBA's non-profit status revocation and the commingling of funds. *Id.* ¶ 35.

Kelly approached Titterton with his concerns over the PBA's spending. *Id.* ¶ 36. Titterton told Kelly of the PBA board's hostility towards Titterton's efforts to raise his concerns. *Id.* at ¶ 37. The two also discussed the board's failure to hold quarterly meetings or to show members the yearly financials at the general meeting, and various unauthorized purchases. *Id.* ¶¶ 37–40.

In early 2018, Titterton reported that Tucker had implemented policies allowing him to manipulate compensatory time to the Borough Administrator, Shelby Smith. *Id.* ¶ 45. After Titterton's reports of Tucker's manipulations of the schedule, he began to experience what he perceived as "retaliatory acts." *See id.* ¶ 57. On April 11, 2018, Tucker called Titterton to his office where they discussed his "negative attitude and insubordination," his "bad attitude and poor work performance," and his improperly prepared reports. *Id.* ¶¶ 64, 68, 73–77. Titterton asked to bring a fellow officer as a witness to the discussion where Tucker made sarcastic remarks about the witness' presence. *Id.* ¶¶ 66–67.

In early May 2018, Titterton learned of an Internal Affairs investigation against him stemming from his assistance to another local law enforcement agency as it pursued a fugitive suspect. *Id.* ¶¶ 79–80. The investigation concerned whether Titterton improperly engaged in a pursuit. *Id.* ¶ 81. As the officer in charge of Titterton's squad, Kelly was summoned to give a

statement. *Id.* ¶ 83. When Kelly defended Titterton, asserting Titterton had not pursued the suspect's vehicle, Tucker accused Kelly of lying to protect Titterton. *Id.* ¶¶ 84–87. Other officers told Titterton that video showed him engaged in a pursuit, but Tucker refused to show him the footage. *Id.* ¶¶ 88–89. At the end of May, Tucker and DiValentino told Titterton the investigation had concluded and several disciplinary charges were entered against him. *Id.* ¶ 90. Both men refused to tell Titterton the charges against him or allow him to see the evidence collected. *Id.* ¶ 91. Titterton told Tucker and DiValentino that he believed the investigation violated the Department's internal investigation policies. *Id.* ¶ 92–93. In response, the Department changed its internal investigation policy to allot more time for internal investigations without providing a hearing on the policy change, which Titterton believed to be an unfair labor practice. *Id.* ¶¶ 94–95. He filed a complaint with U.S. Federal Labor Relations Authority. *Id.* ¶ 96.

Titterton made another report in September 2018 that Tucker continued to manipulate the department schedule by converting straight time into compensatory time in violation of the Collective Bargaining Agreement between the Borough and the PBA. *Id.* ¶ 46. After the second complaint, Titterton no longer received overtime hours, despite making requests for overtime, and Kelly received fewer overtime hours than in previous years. *Id.* ¶¶ 100, 103, 132. In October, Tucker removed Titterton without explanation from the Workplace Safety Committee and replaced him with another officer. *Id*. ¶ 101. That December, the Department learned of Titterton's complaint to the U.S. Federal Labor Relations Authority when a copy arrived at the station. *Id.* ¶ 96. The Fraternal Order of Police attorney informed the Department that Titterton was the officer responsible for the complaint. *Id.* ¶ 98.

Titterton spoke with DiValentino in his office in December 2019 regarding "departmental relationships and issues." *Id.* ¶ 105. By January 2020, the Borough had tasked its assessor, Ronald

Smeal, with addressing the Department's issues and Titterton spoke with Smeal regarding the "issues within the department." *Id.* ¶ 106. At the January 31, 2020 PBA general meeting, Titterton, Kelly, and Officer Jaworski objected to the Board's failure to follow its bylaws and listed several complaints, including that the Collective Bargaining Unit met with the Borough to finalize the CBA without receiving input from its member officers. *Id.* ¶¶ 107,11. Tucker grew angry and demanded Officer Jaworski identify his problem with the newly approved CBA, to which Jaworski responded that his problem was the Collective Bargaining Unit's failure to follow the bylaws. *Id.* ¶¶ 113, 114. Another officer told those present that the Collective Bargaining Unit had not provided updates to officers on negotiations in previous negotiations and that did not think there was any failure to follow the bylaws. *Id.* ¶ 115. Titterton opined that the bylaws required officers be consulted before the Collective Bargaining Unit met with the Borough. *Id.* ¶ 116.

On February 4, 2020, Tucker placed Titterton, Kelly, and Jaworski on "Squad D" effective March 9, 2020. *Id.* ¶¶ 117, 120. The members of Squad D were denied access to adequate Personal Protective Equipment ("PPE") during the COVID-19 pandemic, received less overtime pay, were not notified of meetings or contract negotiations, and were singled out both at the station and on social media. *Id.* ¶¶ 118–125, 147, 152.

On May 16, 2020, DiValentino responded to a Facebook comment complimenting him for his leadership, "thank you [ ], but when you have *10* professional, hard working [sic] and community minded people it's easy." ECF No. 1-2, Ex. G (emphasis added). Plaintiffs believe DiValentino's Facebook post singles them out because, including Squad D, the Department has thirteen police officers. Am. Compl. ¶ 156. Later in May, Titterton and Kelly saw a picture of a slug captioned "spineless wonders" hanging on a filing cabinet in a supervisor's office, which they allege targeted them. *Id.* ¶ 130.

In June, a Department clerk told Titterton she had overheard Tucker telling other officers that Titterton had formed a sexual relationship with the Borough Administrator, Shelby Smith, to elicit information from her. *Id.* ¶ 157. The clerk told Titterton that Tucker told her that Tucker had footage of Titterton and Borough Administrator Smith. *Id.* ¶ 158.

In July 2020, after other officers began to complain that Titterton's patrol car was mud-spattered, DiValentino "accused [Titterton] of getting dirt on the vehicle purposefully and intentionally." *Id.* ¶ 160–161. In October 2020, Titterton was admonished for over-sanitizing a police vehicle, and after other officers complained of the extra cost to the Department of over-sanitizing vehicles, DiValentino spoke with Titterton and Officer Jaworski. *Id.* ¶¶ 163, 174. DiValentino told both officers that that if they had a problem with the Department, the problems could be dealt with internally. *Id.* ¶¶ 179–180. DiValentino also expressed his concern that "[the officers] do not have any friends in the department and that 'no one wants to hurt you.'" *Id.*

Still employed by the Department but driven by what they characterize as a "continuous practice of discrimination," Plaintiffs filed a complaint against Defendants on November 19, 2020. *See* ECF No. 1. The docket lay dormant until March when we sent a letter reminding Plaintiffs of their obligation to serve Defendants. *See* ECF No. 4. The parties then filed, and we approved, a stipulation permitting Plaintiffs to file an amended complaint and to extend Defendants' time to respond. *See* ECF No. 6.

On March 9, 2021, Plaintiffs filed a nine-count amended complaint consisting of two hundred and ninety-six disorganized paragraphs. *See* ECF No. 7. Plaintiffs allege in Count I that DiValentino, and Tucker violated their First Amendment rights under 42 U.S.C. § 1983 by retaliating against them for reporting misuses of PBA funds and abuses in scheduling. In Count III, Plaintiffs bring a due process claim for deprivation of a liberty interest in their reputation. In

Counts II and Count IV, Plaintiffs bring *Monell* claims against the Borough. In Count V, Plaintiffs allege violations of the Pennsylvania Whistleblower Act. Count VI alleges a state law defamation claim against DiValentino and Tucker. Count VII alleges a state law false light against DiValentino and Tucker. Count VIII alleges an intentional infliction of emotional distress (IIED) claim against DiValentino and Tucker. Finally, Count IX alleges civil aiding and abetting against all defendants.

Defendants move to dismiss the amended complaint in its entirety. *See* ECF No. 8. Plaintiffs filed their response on May 26, 2021, and Defendants replied on June 9, 2021. *See* ECF Nos. 16, 20.

## II. STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Zuber v. Boscov's*, 871 F.3d 255, 258 (3d Cir. 2017) (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 128 (3d Cir. 2010)) (internal quotation marks omitted). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Our Court of Appeals requires us to apply a three-step analysis under a 12(b)(6) motion: (1) we "must 'tak[e] note of the elements [the] plaintiff must plead to state a claim;' " (2) we "should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth;' " and, (3) "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 675).

We permit "a curative amendment unless such an amendment would be inequitable or futile." *Phillips v. County of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008).

## III. DISCUSSION

Defendants argue that the Amended Complaint fails to allege any plausible claims. We first address Plaintiffs' claims arising under federal law and then turn to Plaintiffs' state law claims.[3]

### A. Plaintiffs' claims under § 1983

In Count I, Titterton and Kelly assert a First Amendment retaliation claim under § 1983 against DiValentino and Tucker in their individual capacity, and in Count II, a § 1983 *Monell* claim against the Borough. In Count III, Plaintiffs bring a "stigma-plus" due process claim against DiValentino and Tucker in their individual capacity, and in Count IV, another *Monell* claim against the Borough. To state a § 1983 claim, plaintiffs must allege defendants, acting under color of state law, deprived them of a right secured by the Constitution or the laws of the United States. *See Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009).[4] We address first Plaintiffs' First Amendment retaliation and due process claims before reaching the *Monell* claims.

### 1. First Amendment Retaliation against DiValentino and Tucker (Count I)

Plaintiffs allege DiValentino and Tucker "engaged in a continuous practice of discrimination against [them] in violation of the continuing violations doctrine." Am. Compl. ¶ 186. However, the continuing violations doctrine does not apply in the context of First Amendment retaliation claims. *See O'Connor v. City of Newark*, 440 F.3d 125, 127–28 (3d Cir.2006). In asserting their First Amendment retaliation claim, Plaintiffs cannot aggregate individually

---

[3] We have jurisdiction over Plaintiffs' claims arising under federal law under 28 U.S.C. § 1331 and 28 U.S.C. § 1343, and over their supplemental state claims under 28 U.S.C. § 1367(a).

[4] Plaintiffs plausibly allege Defendants are state actors. *See* Am. Compl. ¶¶ 12–15.

actionable allegations because "First Amendment retaliation claims are always individually actionable, even when relatively minor." *Id*; *see also Suppan v. Dadonna,* 203 F.3d 228, 234 (3d Cir. 2000) (quoting *Rutan v. Republican Party*, 497 U.S. 62, 76 n.8 (1990)) ("[T]he First Amendment…protects [public] employees…from even an act of retaliation as trivial as failing to hold a birthday party…"). Thus, we note that the two-year statute of limitations for § 1983 claims arising in Pennsylvania precludes consideration of Defendants' conduct that occurred before November 19, 2018.[5] *See Kach*, 589 F.3d at 634.

As public employees alleging First Amendment retaliation, Titterton and Kelly must demonstrate "(1) [they] engaged in activity that is protected by the First Amendment, and (2) the protected activity was a substantial factor in retaliatory action by the employer." *Gorum v. Sessoms*, 561 F.3d 179, 184 (3d Cir.2009). If they satisfy the first two elements, the burden shifts to Defendants to prove that "the same action would have been taken even if the [First Amendment activity, including speech] had not occurred." *Falco v. Zimmer*, 767 F. App'x. 288, 299 (3d Cir. 2019) (citations omitted).

## a. Protected Activity

"The [Supreme] Court has made clear that public employees do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). When public employees speak in the course of their employment, they "are not speaking as citizens for First Amendment purposes, and

---

[5] Thus, for example, Titterton's second report that Tucker continued to manipulate the department schedule in September 2018 that allegedly resulted in Titterton no longer receiving overtime hours in October 2018 is not actionable. Am. Compl. ¶¶ 46, 100. Neither is Titterton's October 2018 removal from the Workplace Safety Committee. *Id.* ¶ 101.

the Constitution does not insulate their communications from employer discipline." *Id.* at 421. But, where public employees speak as citizens on matters of public concern, we ask "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Id.* at 418

Thus, a public employee's speech is only protected when "(1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have 'an adequate justification for treating the employee differently from any other member of the general public' as a result of the statement he made." *Flora v. County of Luzerne*, 776 F.3d 169, 175 (3d Cir. 2015) (quoting *Garcetti*, 547 U.S. at 418).

Under *Garcetti*, the threshold determination of whether the speech was incident to a public employee's official duties—and thus unprotected by the First Amendment—is a "practical one." *Garcetti*, 547 U.S. at 424–425. The "critical question" is "whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks*, 573 U.S. 228, 240 (2014).

No "comprehensive framework" exists to guide us in performing "*Garcetti*'s practical inquiry," but "contours" for the inquiry are available. *Id.* at 177 (quotation omitted). Factors we may consider include: "(1) whether the employee's speech relates to special knowledge or experience acquired through his job; (2) whether the employee raises complaints or concerns about issues relating to his job duties 'up the chain of command' at his workplace; (3) whether the speech fell within the employee's designated responsibilities, and (4) whether the employee's speech is in furtherance of his designated duties, even if the speech at issue is not part of them." *Kimmett v. Corbett*, 554 F. App'x 106, 111 (3d Cir. 2014) (quotations omitted).

Count I does not allege facts identifying the speech forming the basis of Plaintiffs' claim and instead contains only legal conclusions. *See* Am. Compl. ¶¶ 188–203. We understand Plaintiffs as alleging that Defendants' "continuous practice of discrimination" began in "late 2017" in retaliation for Titterton's report to the PBA general meeting that the organization had lost its tax-exempt status and for his subsequent report to the Borough. Am. Compl. ¶¶ 30–35, 186. However, the continuing violations doctrine does not apply in the context of First Amendment retaliation claims and Plaintiffs allege only that this speech "was met with hostility from Defendants and other PBA members" without pleading any other facts. *See O'Connor*, 440 F.3d at 127; Am. Compl. ¶ 40. Given that Titterton "was met with hostility" for a report he made in "late 2017," but does not allege when, much less *how*, we infer that he was met with hostility immediately or soon after this speech, which precludes its consideration.

After careful review of the Amended Complaint, we identify the following speech that, as alleged, resulted in discrete acts by Defendants and could serve as the conceivable predicates for First Amendment retaliation, excluding those alleged to have caused time-barred retaliatory acts: (1) a December 2019 conversation with DiValentino about issues in the Department; (2) Plaintiffs' January 2020 discussions with Assessor Ronald Smeal who was hired by the Borough to investigate the officers' concerns; and (3) Plaintiffs' comments during the January 2020 PBA meeting requesting that contract negotiations be transparently communicated with the Department. *See* Pl. Br. in Opp., ECF No. 16 at 24–25.

We now ask whether these instances of speech were "ordinarily within the scope of [their] duties." *Lane*, 573 U.S. at 240. We find that Plaintiffs have not alleged facts showing that any of the predicate speech occurred outside the scope of their duties as police officers. Nor can we reasonably infer that their speech was outside the scope of their duties, particularly given the mode

and manner of their speech. *See Falco v. Zimmer*, 767 Fed. App'x 288, 306 (3d Cir. 2019). Each actionable instance of speech was made in an internal forum. In *Gorum v. Sessoms*, 561 F.3d 179, 187 (3d Cir. 2009), our Court of Appeals explained that a public employee's internal complaint is not protected by the First Amendment where "[t]here is no evidence in the record that [the employee] even made a public statement[, and] [t]here is no proof that he thought any public policy issues were at stake." Plaintiffs have not alleged any facts indicating they wanted the public to learn of any purported misconduct nor have Plaintiffs alleged facts permitting us to infer they believed the actionable speech implicated issues of public policy.

As to the December 2019 conversation with DiValentino, Titterton's conversation raised complaints or concerns up the chain of command about the Department. *See Kimmett*, 554 F. App'x at 111. This conversation—which occurred in DiValentino's office—aired concerns about internal department matters that are more akin to mundane employment grievances than matters of public concern. *See Falco*, 767 F. App'x at 302–303 ("If, for example, a discrete unit of speech addresses only the employee's own problems and, even if those problems 'brush ever so gently against a matter of public concern' by virtue of that employee's public employment, then that speech is merely a 'personal grievance.') (citation omitted). Likewise, Titterton's January 2020 conversation with Assessor Smeal aired the same concerns about "departmental relationships and issues" that he discussed with DiValentino in a forum provided to specifically address his and other officers' concerns to improve workplace conditions. *See* Am. Compl. ¶¶ 105–106. Plaintiffs' comments made in the January 2020 PBA meeting were made as employees on the clock regarding the PBA's compliance with its own bylaws in employment contract negotiations. Titterton and Kelly's speech cannot be disentangled from their roles as Department police officers and they pleaded no facts to show they spoke as citizens. At bottom, we rest on the premise that "while the

First Amendment invests public employees with certain rights, it does not empower them to "constitutionalize the employee grievance." *Garcetti*, 547 U.S. 410, 420 (quoting *Connick v. Myers*, 461 U.S. 138, 154 (1983)).

As Titterton and Kelly spoke incident to their official duties as public employees, we need not reach whether the statements involved matters of public concern or whether Defendants were adequately justified in their treatment of Plaintiffs. *See Kimmett v. Corbett*, 554 F. App'x 106, 111 n.9 (3d Cir. 2014). Accordingly, we will dismiss Plaintiffs' Count I without prejudice. As we cannot say that amendment is futile, we will give leave to amend. *See Phillips*, 515 F.3d at 245.

### 2. *"Stigma-plus" Claim against DiValentino and Tucker (Count III)*

In Count III, Titterton and Kelly assert a stigma-plus claim against DiValentino and Tucker, alleging they suffered a reputational injury that constituted a constitutional deprivation when Defendants "made numerous false statements" about them.

Plaintiffs asserting a stigma-plus claim, a due process claim for deprivation of a liberty interest in reputation, must allege (1) a stigma to their reputation plus (2) a deprivation of an additional right or interest. *Hill v. Borough of Kutztown*, 455 F.3d 225, 236 (3d Cir. 2006). To satisfy the stigma prong of the test, plaintiffs must allege the stigmatizing statements "(1) were made publicly, and (2) were false." *Id*; *see also Brown v. Montgomery County*., 470 Fed.App'x. 87, 91 (3d Cir.2012) (explaining the "stigma" prong requires the "1) publication of 2) a substantially and materially false statement that (3) infringed upon the reputation, honor, or integrity of the employee"). In a public employment context, plaintiffs must allege the employer "create[d] and disseminate[d] a false and defamatory impression about the employee in connection with [their] termination." *Hill v. Borough of Kutztown*, 455 F.3d at 236 (quotation omitted).

We understand the statements Plaintiffs allege caused stigma to their reputations were DiValentino's Facebook comment about the Department's ten hardworking officers, the slug photo captioned "spineless wonders" hung on a filing cabinet, and Tucker's comment to other officers that Titterton had a sexual relationship with the Borough Administrator, Shelby Smith. Am. Compl. ¶¶ 130, 156, 157.

Plaintiffs plead no facts supporting their conclusion that Defendants made the first two stigmatizing statements about them beyond vague speculation that they "had reason to believe" the statements targeted them. *See Paterno v. Pennsylvania State Univ.*, 149 F. Supp. 3d 530, 541 (E.D. Pa. 2016), *aff'd*, 688 F. App'x 128 (3d Cir. 2017) (rejecting plaintiffs' proffered statements where plaintiffs were not specifically named). Plaintiffs argue DiValentino's Facebook post singles them out because DiValentino would have mentioned thirteen hardworking officers had he intended to include Titterton, Kelly, and Jaworski, the members of Squad D. They allege no facts permitting the inference that they are the "spineless wonders" of the slug photo posted in a supervisor's workspace. These proposed interpretations are both speculative.

Even if the statements could reasonably be said to target Plaintiffs, they are "not sufficiently stigmatizing to implicate a liberty interest." *Cf. Brown v. Montgomery County.*, 470 F. App'x 87, 91 (3d Cir. 2012) (affirming district court's finding that public statements describing employees' malfeasance at a work function were insufficiently stigmatizing). A statement is sufficiently stigmatizing when it impairs the employee's reputation, honor, or integrity. *See id.* Employer statements alleging "merely improper or inadequate performance, incompetence, neglect of duty or malfeasance" do not implicate a liberty interest of constitutional significance and thus do not satisfy the stigma prong. *Id.* (quoting *Mercer v. Cedar Rapids*, 308 F.3d 840, 845–46 (8th Cir. 2002)). Here, the worst inferences we could plausibly draw from the slug poster and

the Facebook comment is that Defendants' statements implied that Plaintiffs are lazy and do not measure up to the higher standards set by their fellow police officers. Even drawing the worst-possible inferences, neither statement is sufficiently stigmatizing.

As for the final statement, Tucker's comment regarding a sexual relationship between Titterton and DiValentino, Plaintiffs have not alleged the statement was made publicly. *See Yu v. United States Dep't of Veterans Affairs*, 528 F. App'x. 181, 185 (3d Cir.2013) (explaining that publication requires dissemination to the general public); *see also Khan v. City of Paterson*, 2018 WL 2059550, at *8 (D.N.J. May 2, 2018) (finding plaintiff failed to plausibly allege comments regarding a purported sexual relationship between plaintiff and another person were made publicly).

Even if Plaintiffs had pleaded facts alleging Defendants made false and stigmatizing statements satisfying the stigma prong, their claim nonetheless fails because they cannot satisfy the plus prong. Defendants argue Titterton and Kelly's claim fails because they have not been terminated or suffered the deprivation of any additional right. Defs. Br., ECF No. 8-1 at 21. Plaintiffs respond that as union employees, they are not required to allege a termination, and have stated a claim for relief by alleging "alteration or extinguishment of a right or status previously recognized by state law." Pls. Br., ECF No. 16 at 34 (citing *Paul v. Davis*, 424 U.S. 693, 711 (1976)). Only "[i]n cases not involving union employees, [has] the Third Circuit has found that a loss of a job may be necessary." *Id.* They argue the denial of time off to get a COVID test which forced Titterton to use two shifts of sick time was an "an alteration of a right without process" in violation of the CBA. *Id.* at 34–35.[6]

---

[6] To the extent Plaintiffs also identify Titterton's internal affairs investigation where he was denied access to the investigation report as a deprivation, we note that alleged incident occurred in May 2018, outside the applicable statute of limitations. *See Kach v. Hose*, 589 F.3d at 634 (identifying the statute of limitations for a § 1983 claim arising in Pennsylvania as two years).

We agree with Plaintiffs that a "constitutionally protected property interest—created and defined by state statutory law and the terms of the CBA" may serve as the "plus" in lieu of a termination. *See id.* However, Plaintiffs' proffered property interest—having to use two shifts worth of sick time, which was later restored, to get a COVID test and await its results—is insufficient to plausibly allege the "plus" prong of the "stigma-plus" claim. *Cf.*, *Smith v. Borough of Dunmore*, 633 F.3d 176, 180 (3d Cir. 2011) (finding plaintiff had a property interest in not being suspended without cause for eight days); *Dee v. Borough of Dunmore*, 549 F.3d 225 (3d Cir.2008) (same). Plaintiffs' garden-variety complaints bear "little resemblance to other rights and property interests that have been deemed fundamental under the Constitution." *Nicholas v. Pennsylvania State Univ.*, 227 F.3d 133, 143 (3d Cir. 2000). Accordingly, we will dismiss Plaintiffs' stigma-plus claim without prejudice.

### 3.  Monell *claims (Counts II and IV)*

In Counts II and Count IV, Plaintiffs bring *Monell* claims against the Borough, alleging the Borough is liable for Tucker and DiValentino's constitutional violations. Under § 1983, a municipality is liable where a plaintiff demonstrates the municipality, through a policy, custom, or practice, caused a constitutional violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). As we have found Plaintiffs failed to plausibly allege the underlying constitutional violations, Plaintiffs cannot sustain their *Monell* claims. *See Wilson v. City of Philadelphia*, 177 F. Supp. 3d 885, 908 (E.D. Pa. 2016). We will dismiss Counts II and IV without prejudice.

In the Amended Complaint, Plaintiffs allege "DiValentino and Tucker are policymakers for the purpose of a claim against the township." Am. Compl. ¶¶ 205, 223. We note that a borough

police chief does not per se have final policymaking authority, which is "a key element of a *Monell* claim." *See Santiago v. Warminster Twp.*, 629 F.3d 121, 135 n. 11 (3d Cir. 2010).

State law governs the determination of whether a police chief is a policymaker. *See id* ("as a matter of Pennsylvania state law, a township Police Chief is not a final policymaker")*.* Because Jenkintown is a borough, the Borough Code applies to determine whether its police chief is a policymaker. The Borough Code gives the mayor "full charge and control of the chief of police and police force." 8 Pa. Stat. Ann. § 1123.1(a) (West). Plaintiffs allege that the Borough's mayor was copied on an email reprimanding Plaintiff for an error on his timesheet but not that he or she played any role in the alleged constitutional violations. *See* Am. Compl. ¶ 104. Thus, even if Plaintiffs had plausibly alleged the underlying constitutional violations, we would dismiss their *Monell* claims because they have not pleaded facts to support a key element of their *Monell* claim.

### B.    Plaintiffs' State Law Claims

"A district court can decline to exercise supplemental jurisdiction in several circumstances, including a situation where 'the district court has dismissed all claims over which it has original jurisdiction,' as in this case." *Trinity Indus., Inc. v. Chi. Bridge & Iron Co.*, 735 F.3d 131, 135 (3d Cir.2013) (quoting 28 U.S.C. § 1367(c)(3)). Having dismissed Plaintiffs' federal claims, we could decline to exercise supplemental jurisdiction over the state law claims but will assert jurisdiction to address the plausibility of the pleading before us.

### 1.    *Retaliation and Hostile Work Environment under the Pennsylvania Whistleblower Law (Count V)*

In Count V, Plaintiffs assert a claim under the Pennsylvania Whistleblower Law (PWL), 43 Pa. Stat. Ann. §§ 1421–1428 (West). Titterton and Kelly allege they were retaliated against for reporting the PBA's commingling of funds and the loss of its non-profit status, Tucker's misuses of compensatory time, and what they deemed a hostile work environment.

To establish a prima facie case under the Pennsylvania Whistleblower Law, Plaintiffs must show they (1) made a good faith report of wrongdoing or waste to the appropriate authorities and (2) "come forward with some evidence of a connection between the report of wrongdoing and the alleged retaliatory acts." *Id.* § 1424(b). The PWL defines "wrongdoing" as "[a] violation which is not of a *merely technical or minimal nature* of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer." *Id* (emphasis added). "Waste" is defined as "[a]n employer's conduct or omissions which result in *substantial* abuse, misuse, destruction or loss of funds or resources belonging to or derived from Commonwealth or political subdivision sources." *Id* (emphasis added). A "good faith report" is "[a] report of conduct defined in this act as wrongdoing or waste which is made without malice *or consideration of personal benefit* and which the person making the report has reasonable cause to believe is true." *Id.* (emphasis added).

The PWL contains a mandatory time limit. "[A] person who alleges a violation of this act may bring a civil action ... within 180 days after the occurrence of the alleged violation." 43 Pa. Stat. Ann. § 1424(a). Despite the use of the permissive "may," the Whistleblower Law's "180-day time limit is mandatory, and courts have no discretion to extend it." *O'Rourke v. Pa. Dep't of Corr.*, 730 A.2d 1039, 1042 (Pa.Commw.Ct.1999). Thus, only retaliation that occurred within 180 days of November 19, 2020 is actionable. The retaliatory acts Plaintiffs allege they experienced include "ceasing communication with Plaintiffs' squad, taking away overtime hours, denying access to PPE during the current pandemic, and numerous other acts known and unknown to Plaintiffs." Am. Compl. ¶ 233; *see also* Pl. Br., ECF No. 16 at 37–38 (identifying additional time-barred retaliatory acts). After sifting through the Amended Complaint to determine when these

retaliatory actions occurred, we find Plaintiffs did not allege an actionable retaliatory action, as they each occurred before May 23, 2020, which is 180 days before Plaintiffs' filed their complaint.

We will dismiss Plaintiffs' PWL claim without prejudice to permit Plaintiffs to amend and plainly state the legal basis for their whistleblower claim, including the specific retaliatory act(s) taken against them in connection with their reporting of an actionable wrongdoing.

### 2. *Defamation and False Light (Counts VI and VII)*

The Amended Complaint brings defamation and false light invasion of privacy claims against DiValentino and Tucker. The actionable statements plaintiffs identify for both claims are DiValentino's Facebook comment about the Department's ten hardworking officers, the slug photo captioned "spineless wonders" hung on a filing cabinet, and the overheard comment Tucker made to other officers that Titterton had a sexual relationship with the Borough Administrator. Am. Compl.¶¶ 244–246; 259–261. As both claims are premised on the same set of underlying facts, we will consider them together. *See Graboff v. Colleran Firm*, 744 F.3d 128, 137 (3d Cir. 2014).

### a. Defamation

To state a Pennsylvania defamation claim, plaintiffs must show: (1) The defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to the plaintiff; (6) special harm resulting to the plaintiff from its publication; and (7) abuse of a conditionally privileged occasion. *Joseph v. Scranton Times, L.P.*, 129 A.3d 404, 424 (Pa. 2015).

In defamation actions, we must make a threshold determination of whether challenged statements are capable of defamatory meanings. *See Byars v. Sch. Dist. of Phila.*, 942 F.Supp.2d

552, 564 (E.D.Pa.2013) ("Whether a statement is capable of a defamatory meaning is a question of law for the court."). "A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Thomas Merton Ctr. v. Rockwell Int'l Corp.*, 442 A.2d 213, 215 (Pa. 1981). Crucially, "[t]he statement must do more than merely embarrass or annoy [them]; it must provoke 'the kind of harm which has grievously fractured [their] standing in the community of respectable society.'" *Graboff*, 744 F.3d at 136 (quoting *Tucker v. Phila. Daily News*, 848 A.2d 113, 124 (Pa. 2004)). Courts distinguish between actionable defamation and mere obscenities, insults, and other verbal abuse. *See, e.g.*, *Kryeski v. Schott Glass Techn., Inc.*, 626 A.2d 595, 601 (1993) ("[S]tatements which are merely annoying or embarrassing or no more than rhetorical hyperbole or a vigorous epithet are not defamatory.").

Neither the slug photo nor the Facebook post can be reasonably said to rise above a "merely annoying statement." Neither are capable of a defamatory construction and it strains credulity to infer that either statement is capable of "caus[ing] special harm to Plaintiffs' character and credibility as police officers." Am. Compl. ¶ 247.

As to the final alleged defamatory statement, Plaintiffs alleged that a Department clerk told Titterton that she overheard Tucker telling other officers of his sexual relationship with the Borough Administrator. *Id.* ¶ 157. This is "far too speculative a reed to hang a defamation charge upon… [We] will not turn gossip into a charge of defamation." *White v. Baldwin Sch.*, 2012 WL 4963688, at *4 (E.D. Pa. Oct. 17, 2012). As Plaintiffs fail to state a claim for defamation, we will dismiss Count VI without prejudice.

b.  False Light

Plaintiffs claim Tucker and DiValentino invaded their privacy by placing them in a false light based on the Facebook post, the slug photo, and the overheard comment about Titterton's sexual relationship with the Borough Administrator. Am. Compl. ¶¶ 259–261. To state a claim for false light under Pennsylvania law, plaintiffs must allege facts showing that the published material "is not true, is highly offensive to a reasonable person, and is publicized with knowledge or in reckless disregard of its falsity." *Graboff*, 744 F.3d at 136. The tort requires "such a major misrepresentation of [the plaintiff's] character, history, activities or beliefs" that a reasonable person in the plaintiff's position would take serious offense at the false impression created. *Mzamane v. Winfrey*, 693 F. Supp. 2d 442, 511 (E.D. Pa. 2010) (quotation omitted). "Publicity" means "that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Doe v. Wyo. Valley Health Care Sys., Inc.*, 987 A.2d 758, 765 (Pa. Super. 2009) (quoting Restatement (Second) of Torts § 652D cmt. A (1977)).

Plaintiffs allege the statements were "highly offensive to a reasonable person, [and] a 'major misrepresentation' of [their] reputation, character, competence, personal history…" Am. Compl. ¶ 264. Again, "whether the communication is capable of bearing a particular meaning which is highly offensive to a reasonable person is a question for the Court." *Mallory v. S & S Publishers*, 168 F. Supp. 3d 760, 776 (E.D. Pa. 2016) (quotation omitted). Neither the Facebook post nor the slug photo can be construed as "highly offensive to a reasonable person" and neither statement even maligns Plaintiffs individually. Of the three statements, only the Facebook post was "made public" to satisfy the tort's publicity requirement. Moreover, the false light claim fails because Titterton and Kelly failed to plead facts supporting the inference that Defendants acted with actual malice. *See McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 360 (3d Cir.

2020) (citing 3 Restatement (Second) of Torts § 652E (1997)). As Plaintiffs have not satisfied the elements of a false light claim, we will dismiss Count VII without prejudice.

### 3. Intentional Infliction of Emotional Distress (Count VIII)

To state an intentional infliction of emotional distress (IIED) claim under Pennsylvania law, Titterton and Kelly must show "extreme and outrageous conduct" that intentionally caused them "severe emotional distress." *Hoy v. Angelone*, 720 A.2d 745, 753 (1998). Conduct meets the requisite level when it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Id.* at 754.

None of the conduct alleged—assignment to "Squad D," denial of overtime opportunities, exclusion from internal communications, and being denied access to PPE—rises to the requisite level of atrocity. *Cf Smith v. RB Distribution, Inc.*, 2021 WL 242473, at *6 (E.D. Pa. Jan. 25, 2021) (finding "crude and anatomically specific" comments, persistent physical groping and propositions, and separate acts of retaliation sufficiently outrageous). Accordingly, we will dismiss Plaintiffs' IIED claim without prejudice.

### 4. Civil Aiding and Abetting (Count IX)

Aiding and abetting claims require an underlying tort cause of action. *Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 446 (3d Cir. 2000). As Plaintiffs have not sufficiently pleaded any tortious conduct, we will dismiss Count IX without prejudice.

## IV.    CONCLUSION

For the foregoing reasons, we will dismiss Plaintiffs' Amended Complaint without prejudice. An appropriate order follows.

/s/ Chad F. Kenney
_____
CHAD F. KENNEY, JUDGE